ROBERT A. BREWER, *et al.*,        )
                                  )
                 Plaintiffs,     )
      v.                        )    C.A. No. 08-196 Erie
                                    )    District Judge McLaughlin
UNITES STATES OF AMERICA,     )
                                  )
               Defendant.    )
                                  )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon a motion for summary judgment filed by the United States of America as Defendant. For the reasons which follow, Defendant's motion for summary judgment will be granted.

## I. BACKGROUND

On April 16, 2005, at approximately 4:00 p.m., Plaintiffs Robert Brewer, his minor daughter Jennie Brewer, and minor Anthony Mazzocco were passengers in a 2000 Ford Explorer driven by Plaintiff Ryan Mazzocco on Forest Service Road 154 ("FR 154") in the Allegheny National Forest ("ANF"). (Pennsylvania Police Crash Reporting Form, pp. 1-3). The Mazzoccos and Brewers were returning from a fishing trip to the Farnsworth Fish Hatchery, located within the ANF, when Ryan Mazzocco ("Mazzocco") lost control of the vehicle, drove off the road and collided with a tree, causing injuries to all passengers. (Mazzocco Depo., pp. 17-27).

FR 154 consists of a single lane, limestone surfaced road utilized primarily to provide recreational access to sites within the ANF. (Salm Decl. ¶¶ 11-15). According to Plaintiffs,

Mazzocco was proceeding along FR 154 when he noticed an oncoming vehicle and pulled off to the far right side of the road in order to create enough space for the other vehicle to pass.[1] (Mazzocco Depo., pp. 44-45, 120-24). Mazzocco brought his vehicle to a "dead stop" to allow the oncoming vehicle to safely proceed. (Brewer Depo., pp. 50, 53-54, 97-98). Thereafter, while attempting to merge his vehicle back towards the center of FR 154, Mazzocco "lost control after hitting potholes in the roadway," causing the vehicle to "fishtail" and spin out of control. (Pennsylvania Police Crash Reporting Form, p. 1; Mazzocco Aff. ¶ 18; Mazzocco Depo., pp. 17-19).

The ANF contains approximately 1,282 miles of Forest Service Roads, many of which, like FR 154, are single lane, unpaved roads. (Salm Decl., ¶ 10). As a result of weather conditions, vehicle traffic, and other factors, unpaved roads such as FR 154 regularly acquire "irregularities" and "potholes." (Duckett Depo., ¶ 20). While the parties disagree as to the severity of the condition of FR 154 at the time of the accident, it is undisputed that there were potholes and irregularities on the section of the road where the accident occurred.[2] Mazzocco stated at deposition that he was generally familiar with the road conditions on FR 154, including the frequent presence of potholes, because he had driven the road in the past while accessing his family's camp. (Mazzocoo Depo., pp. 23, 67-68). Indeed, Mazzocco had already driven over the particular stretch of FR 154 where the accident occurred earlier that day while traveling to the Farnsworth Fish Hatchery. (Transcript, Oral Hearing, 5/25/11, p. 60).

---

1    Defendant, citing the testimony of an independent witness to the accident, contests Plaintiffs' assertion that an oncoming vehicle forced Mazzocco to pull to the side of the road. The witness, Stephen Bates, testified that he watched the crash happen and that there were no other cars on the road at that time. Bates also opined that, in his view, the accident occurred because Mazzocco was driving too fast for road conditions. (Bates Depo., p. 9; Pennsylvania Police Crash Reporting Form, pp. 5-6). However, for reasons described more fully herein, this dispute is not material to the resolution of the instant motion for summary judgment.

2    The Forest Service's own Motor Vehicle Accident Investigation Engineering Report described the presence of "pothole conditions . . . over most of the road" but categorized the overall road surface as "hard, dry and in good shape." (FS Engineering Report, p. 1). Forest Service Civil Engineer James Duckett testified that the road was not "any worse than any other road we had out there." (Duckett Depo., p. 20).

The Forest Service holds an annual meeting in February or March to discuss the condition of roads within the ANF and to determine which roads require maintenance and grading during the upcoming year. (Duckett Decl., ¶ 11). Although the Forest Service does not formally inspect roads prior to grading, it seeks input as to the condition of the roads at the annual meeting from Forest Rangers and Forest Service Employees who drive over those roads every day in the course of their employment. (Duckett Decl., ¶¶ 10-12). After compiling a complete list of each road that will be graded in a given year, the Forest Service designates a certain number of those roads as "priority" roads which must be graded prior to all other roads that do not receive the "priority" designation. (Duckett Decl., ¶ 15). Priority is determined by the Forest Service on the basis of factors such as safety, road condition, anticipated and historical road use, road surface, and availability of funding for road projects. (Duckett Decl, ¶ 16).

For both 2004 and 2005, FR 154 was designated as a "priority" road. (Duckett Decl., ¶ 20). In 2004, FR 154 was graded on May 6, 2004 and on July 26, 2004. (Duckett Decl., ¶ 22). In 2005, the first road grading on FR 154 took place on July 7, 2005. (Duckett Decl., ¶ 23). The Forest Service explained that road grading cannot be performed prior to the spring thaw – which typically occurs in late April or May - because of safety and practical concerns such as ground conditions, temperature, unpredictable winter weather, and because "grading a road before this period causes damage to the road surface . . . [and] creates additional road maintenance and expense." (Duckett Decl., ¶ 11; Salm Depo., pp. 75, 94).

On single-lane roads in the ANF, such as FR 154, the Forest Service constructs turnouts[3] to allow vehicles heading in opposite directions to safely pass. (Forest Service Engineering Report, Def. Ex. 7; Duckett Depo., p. 17). At oral argument, the following physical description of a turnout on FR 154 was provided:

---

3        A turnout is defined as "a portion of a road that has been widened to allow cars to pass or park." See http://www.thefreedictionary.com/turnout.

There is a 50-foot transition from the 12-foot wide [road] to 22-foot wide. Then 50 feet full length to 22-feet wide. And then another 50-foot transition back to the normal 12 foot.

(Transcript, Oral Hearing, 5/25/11, p. 26; 2001 Farnsworth Road Reconstruction Project Documents, Plaintiffs' Ex. Q). The record also contains two photographs of a turnout on FR 154 taken by Plaintiffs' expert. (Kolmus Report, Plaintiffs' Ex. E, Enclosures 11-12).

There are no posted speed limit signs on FR 154 or on other unpaved roads in the ANF. (Salm Decl., ¶ 19). In 2001, FR 154 was reconstructed to add additional turnouts and a limestone surface, among other improvements, in an effort to make the road safer for motorists. (Salm Decl., ¶ 15; Salm Depo., pp. 43-44, 64-65). Since that reconstruction, the Forest Service is not aware of any serious accidents or injuries that have occurred on FR 154 other than those suffered by Plaintiffs. (Salm Decl., ¶ 26).

## II. STANDARD FOR REVIEW

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed. R. Civ. P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3rd Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.

Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3rd Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3rd Cir. 1990) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3rd Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." Firemen's Ins. Company of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3rd Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

## III.  ANALYSIS

Plaintiffs filed this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §
1346, alleging that the United States Forest Service ("Forest Service") negligently failed to properly
maintain and inspect FR 154 and failed to provide appropriate signage with respect to the speed limit
and availability of turnouts on FR 154.   Although a district court generally lacks jurisdiction over
claims against the federal government, the FTCA serves as a waiver of sovereign immunity for torts
involving "personal injury or death caused by the negligent or wrongful act or omission of any
employee of the Government while acting within the scope of his office or employment."   28 U.S.C.
§ 1346(b); Mitchell v. United States, 225 F.3d 361, 362 (3rd Cir. 2000).   It is a plaintiff's burden to
demonstrate that his or her claims fall within the scope of the FTCA's waiver of governmental
immunity.   In re Orthopedic Bone Screw Prod. Liab. Litigation, 264 F.3d 344, 361 (3rd Cir. 2001).

The FTCA also carves out an exception to governmental liability for certain discretionary
acts performed by government employees:

> The provisions of this chapter . . . shall not apply to -
>
> (a) Any claim based upon an act or omission of an employee of the
> Government . . . based upon the exercise or performance or the
> failure to exercise or perform a discretionary function or duty on
> the part of a federal agency or an employee of the Government,
> whether or not the discretion involved be abused.

28 U.S.C. § 2680.   This exception, known as the "discretionary function" exception, "was designed
to keep the courts from 'second guessing,' through decisions in tort actions, the way that government
officials choose to balance economic, social, and political factors as they carry out their official
duties."   Cope v. Scott, 45 F.3d 445, 449 (D.C. Cir. 1995).   As such, the discretionary function
exception "marks the boundary between Congress' willingness to impose tort liability upon the United
States and its desire to protect certain governmental activities from exposure to suit by private
individuals."   United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467

U.S. 797, 808 (1984). It is the government's burden to prove that the discretionary function exception applies. Cestonaro v. United States, 211 F.3d 749, 756 n. 5 (3rd Cir. 2000).

In United States v. Gaubert, the United States Supreme Court set forth a two-part inquiry to guide the application of the discretionary function exception. Gaubert, 499 U.S. 315, 322-23 (1991); Mitchell, 225 F.3d at 363. First, a court must determine whether the act or conduct at issue involves "an element of judgment or choice." Gaubert, 499 U.S. at 322. Where a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow," see Gaubert, 499 U.S. at 322 (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)), then "the employee ha[s] no 'choice'" and the discretionary function exception does not apply. Cope, 45 F.3d at 448; 28 U.S.C. § 2680(a).

Secondly, if the challenged conduct does involve an element of judgment or choice, the court must then determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23. "[A] decision (or non-decision) must be reasonably related to a policy consideration to fall under the discretionary function exception." Cestonaro v. United States, 211 F.3d 749, 760 (3rd Cir. 2000). This second, "public policy" prong focuses on "the nature of the actions taken and whether they are susceptible to policy analysis" rather than on the subjective intent of the governmental actor. Gaubert, 499 U.S. at 325. Indeed, the very "touchstone of the second step of the discretionary function test is susceptibility to policy analysis." Cestonaro, 211 F.3d at 753 (citing Gaubert, 499 U.S. at 325). Thus, "[w]hat matters is not what the decisionmaker was thinking, but whether the type of decision being challenged is grounded in social, economic, or political policy." Gaubert, 499 U.S. at 325. The more "complex and politically sensitive the decision," and the "more it is connected to uniquely governmental functions," the more likely that it will be shielded as a discretionary function. Maalouf v. Swiss Confederation, 208 F.Supp.2d 31, 36-37 (D.D.C. 2002). Evidence of the actual decision "may be helpful in understanding whether the 'nature' of the decision implicated policy judgments, but

the applicability of the exemption does not turn on whether the challenged decision involved such judgments." Cope, 45 F.3d at 449.

In the instant case, Plaintiffs allege that the Forest Service negligently failed to: (1) properly maintain and grade the surface of FR 154; (2) properly inspect FR 154; (3) provide appropriate speed limit signs on FR 154; and (4) provide appropriate notice of the availability of turnouts on FR 154. At an oral hearing concerning the instant motion for summary judgment, Plaintiffs acknowledged that no "federal statute, regulation or policy specifically prescribe[d] a course of action" that the Forest Service was required to follow with respect to any of the allegations. See Transcript, Oral Hearing, 5/25/11, pp. 4, 62; See also Plaintiffs' Responsive Statement, ¶¶ 41, 54, 63; Gaubert, 499 U.S. at 322. As such, it is conceded that each of the allegedly negligent actions involved "an element of judgment or choice" on the part of the Forest Service, satisfying the first element of the Gaubert inquiry.

With respect to the second Gaubert prong, Plaintiffs dispute whether the Forest Service's exercise of judgment as to the alleged conduct "is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23. I will consider each of Plaintiffs' allegations in turn, keeping in mind that the government "begins this step with the 'strong presumption' that the challenged conduct involves policy considerations." Perez v. United States, 2010 WL 3927628, *8 (D.Virgin Islands 2010) (quoting Gaubert, 499 U.S. at 324); Woolf v. United States, 2009 WL 911042 (D. Utah 2009).

1)      Failure to Maintain FR 154

Plaintiffs' first contention is that the Forest Service failed to maintain a safe driving surface on FR 154 by neglecting to fill potholes and grade the road surface prior to the date of the accident. As discussed above, the Forest Service's policy with respect to road maintenance is to determine what road surfaces need to be corrected at an annual meeting, prioritize roads that require immediate attention, and then grade those "priority" roads as soon as possible. In determining how and when to

grade roads that have acquired potholes and other damage over the winter, the Forest Service considers factors such as the expected use of the road, whether it is intended for recreational, business or mixed use, safety, environmental concerns, economic considerations, and aesthetics. In addition, practical considerations, such as the fact that a road cannot be safely and efficiently graded until after the spring thaw, also factor into the Forest Service's decision-making.

Each of these factors are the type that courts have widely held to be "reasonably related to a policy consideration" so as to fall within the scope of the discretionary function exception. Cestonaro, 211 F.3d at 760. In Mitchell v. United States, for example, the Third Circuit held that the National Park Service's decision-making process in determining how to prioritize necessary repairs and work items was protected by the discretionary function exception. Mitchell, 225 F.3d 361 (3rd Cir. 2000). In Mitchell, the Park Service inherited a stretch of roadway from the Commonwealth of Pennsylvania that was in need of a complete reconstruction and presented numerous safety hazards in the form of encroaching posts, trees, telephone poles and culverts. Because the Park Service lacked sufficient funding to address all of these hazards, the agency was forced to determine priorities and address the most urgent problems first. Id. at 363. Plaintiff brought suit after driving her vehicle off of the road and colliding with a culvert that the Park Service had not yet repaired.

In arguing that the discretionary function exception applied, the Park Service articulated several policy-based factors that were implicated in determining how to maintain and correct the roadway including funding, safety, and the unlikelihood of an accident such as the one suffered by the plaintiff. The Third Circuit agreed with the government that such considerations were adequately grounded in public-policy based objectives:

> The Park Service had to balance the costs of the repairs of every culvert head-wall along Route 209, along with the other safety issues identified . . . against the low risk of an accident. Under these circumstances, we conclude that the Service's decision to determine its repair and design priorities came within the discretionary function exception to the FTCA.

Id. at 366.

Also on point is the court's decision in <u>Woolf v. United States</u>, wherein the district court determined that the Forest Service's choices with respect to prioritizing and maintaining roads in the Wasatch-Cache National Forest ("Wasatch-Cache NF") were protected by the discretionary function exception. <u>Woolf</u>, 2009 WL 911042 at *1. In <u>Woolf</u>, the plaintiff brought suit after her son suffered a fatal accident on a rugged, single-lane road through the forest, claiming that the Forest Service negligently maintained the road. <u>Id</u>. As in the instant case, the Forest Service's practice in the Wasatch-Cache NF was to hold an annual meeting to determine a road maintenance plan and to prioritize between the approximately 1,400 miles of road in the forest. <u>Id</u>. In determining which roads are designated as highest priority, the Forest Service listed factors including "the condition of a road, the number of users, the records of previous maintenance, the geographic proximity, and whether a project was completed during the previous season." <u>Id</u>. The Forest Service also explained that implementing the annual road maintenance plan is dependent upon a number of additional factors including "availability of resources, funding, weather conditions, and the need to respond to emergencies, natural disasters or unplanned needs." <u>Id</u>. The court concluded that each of these factors was sufficiently grounded in public policy to warrant the protection of the discretionary function exception:

> Here, aside from the thousands of miles of other types of roads, the Wasatch-Cache National Forest contains more than 1,000 miles of Maintenance Level Two roads like the Grizzly Peak 4x4 Road. These roads are infrequently traveled, narrow, rocky, single lane, and limited to high clearance vehicles. Recognizing the immense challenges in maintaining these roads, Forest Service policies allow employees discretion to prioritize and choose among competing demands.
>
> Presumptively, the decision regarding whether to maintain the Grizzly Peak 4x4 Road beyond the 1.493 mile point or whether to warn of any potential dangers on that road reflect the same policy considerations that prompted the Forest Service to enact the policies that encourage

employee discretion. See Gaubert, 499 U.S. at 324 (recognizing presumption). The court's further inquiry confirms the validity of this presumption.

> Choices regarding road maintenance and sign placement in a National Forest implicate numerous valid policy considerations, the most compelling of which are public health and safety concerns, the allocation and priority of resources for competing projects, and environmental and natural resource protection. The resources that allow for road maintenance are inherently finite. When considering the relative importance of maintenance on a road or whether to post a sign warning of potential danger, Forest Service personnel must consider various factors, including the risk of any safety hazards, the road's geographic location, its accessibility, how the road affects the need for public access, the road's proximity to other projects and attractions, and the existence of any unique emergencies. Forest Service employees must also bear in mind what must be accomplished in the short maintenance season, which lasts for only about five months of the year. See Blankenburg v. United States, No. 03-16667, 2005 WL 1242128 (9th Cir. May 25, 2005) (recognizing that "the Forest Service is charged with weighing resource program needs, environmental and resource protection requirements, aesthetics, recreational goals, and budgetary concerns in addition to safety when making road maintenance or sign placement decisions").

Id. at *7.

The D.C. Circuit's decision in Cope v. Scott also supports the conclusion that the discretionary function exception applies here. In Cope, the plaintiff was traveling along Beach Drive, a narrow, two-lane road located in an urban park in Washington, D.C., when struck by a sliding vehicle while rounding a curve. Cope, 45 F.3d at 447. Cope filed suit against the National Park Service alleging that the road had been negligently designed, constructed, and maintained, resulting in a "polished" surface and unacceptable "skid-resistance levels." The government argued that the Park Service's "failure to maintain adequate skid resistance" fell within the discretionary function exception because the design and maintenance of the road involved the balancing of various

public policy concerns. After the district court granted summary judgment in favor of the government, the D.C. Circuit affirmed, holding that the discretionary function exception precluded liability:

> The state of Beach Drive alleged by Cope could have been prevented only by reducing the traffic load, initially paving it with a different surface, resurfacing the curve entirely, or at least milling the curve to create grooves in the surface. Determining the appropriate course of action would require balancing factors such as Beach Drive's overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards. These balances are apparent throughout the 1988 study that placed maintenance on this section of Beach Drive in the middle of a priority list of work that needed to be done on eighty different sections of park roads. Park Service decisions regarding the management of Beach Drive are therefore much like the decisions exempted by the Supreme Court in <u>Varig</u>: "[S]uch decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." 467 U.S. at 820, 104 S.Ct. at 2767. And, as in <u>Varig</u>, we decline to "second guess" those judgments here.

<u>Cope</u>, 45 F.3d at 451 (citing <u>Varig Airlines</u>, 467 U.S. at 820) (additional internal citations omitted).

Plaintiffs attempt to distinguish the aforementioned cases by citing *dicta* in <u>Cope</u> wherein the Court suggested that a different result might ensue in a case "involving mundane decisions" such as whether "to fill or not fill potholes." <u>Id</u>. at 451. Plaintiffs seize upon this language and argue that the Forest Service's failure to fill the potholes which allegedly caused their accident is precisely the type of "mundane decision" that is not shielded by the discretionary function exception. (Plaintiffs' Brief in Opposition to Summary Judgment, pp. 11-12). In <u>Cope</u>, however, the Court merely sought to distinguish broad, policy-based planning decisions from routine, day-to-day maintenance issues, using the filling of a pothole as an example of an activity which ordinarily would not require policy

analysis.  Id.  However, in a national forest such as the ANF, filled with hundreds of miles of unpaved single-lane roads, potholes are not isolated obstacles but rather, a pervasive surface condition that affects the quality of the road surface in the same manner that the lack of adequate skid resistance impacted the integrity of Beach Drive in Cope.  Although Plaintiffs disagree with the manner in which the Forest Service addresses the pothole problem in the ANF through biannual grading, rather than by filling individual potholes on an *ad hoc* basis, such judgments cannot be second guessed when they are based on valid policy considerations.  Id. at 451; see also Mitchell, 225 F.3d at 365 (noting that the Forest Service's decision not to reconstruct all drainage ditches on Route 209 was "in line with the major policy decisions at stake in Cope and not the 'mundane, administrative, garden-variety, housekeeping problem'" presented in other cases) (quoting Gotha v. United States, 115 F.3d 176, 181 (3rd Cir. 1987)).  For the foregoing reasons, I conclude that the discretionary function exception applies to the alleged failure to maintain FR 154.

2)      Failure to Inspect FR 154

Plaintiffs next contend that the Forest Service acted negligently in failing to inspect FR 154 prior to the opening day of fishing season in 2005.  The Forest Service concedes that it does not conduct a formal inspection of unpaved roads such as FR 154 on an annual basis.  The Forest Service states that it does not perform formal inspections of road surfaces prior to grading because of various policy considerations including the tremendous size of the ANF, the fact that there are 1,282 miles of Forest Service road within the forest, and the limitations of available staff and funding for such an inspection.  (Defendant's Brief in Support of Summary Judgment, pp. 17-18).  Such considerations have been held to be the type of policy objectives that the discretionary function exception protects.  See, e.g., Varig Airlines, 467 U.S. at 819-20 (holding that the FAA's decision to

implement "spot-check" aircraft inspections was protected by the discretionary function exception because it balanced "policy objectives" such as safety against such "practical considerations as staffing and funding."); Reed v. United States, 231 F.3d 501, 506 (9th Cir. 2000) (holding that the Bureau of Land Management's failure to monitor and inspect an event held on BLM land "involved a balancing of public policy concerns."); Cleveland v United States, 546 F.Supp.2d. 732, 760 (N.D. Cal. 2008) (holding that "the Forest Service's decisions regarding the identification, marking, monitoring, and abatement of possible hazards implicated competing policy concerns, including environmental considerations, public access and safety considerations, resource allocation, and the fact of the National Forest's limited resources."). Moreover, the record reflects that the Forest Service obtains information as to the condition of the roads in the ANF on a constant, ongoing basis by collecting input from Forest Service employees who travel those roads in the course of their employment, providing additional policy-based support for the Forest Service's decision not to allocate finite resources towards formal annual inspections. (Defendant's Brief in Support of Summary Judgment, p. 17; Transcript, Oral Hearing, 5/25/11, pp. 16-17). See Reed, 231 F.3d at 506 (holding that an agency's "ability to obtain monitoring through other means" such as input from local officials and the public is a valid policy consideration). Similarly, the Forest Service's ability to rely on historical data obtained from decades of observing the condition of roads in the ANF is also another policy consideration implicated in the decision not to perform inspections. Id. at 506 (agency exercised policy-based judgment in electing not to monitor an event based in part upon the event's historical record of safety and compliance). As such, the discretionary function exception applies to the Forest Service's exercise of judgment regarding whether to conduct formal road inspections in the ANF.

3)      Failure to Provide Signs Concerning Utilization of Turnouts

Plaintiffs' next allegation is that the Forest Service should have provided signs instructing motorists on FR 154 as to the presence and availability of turnouts to avoid oncoming traffic.

Specifically, Plaintiffs contend that a sign should have been posted on each end of FR 154 stating: "One-lane Road. Turnouts Provided." (Transcript, 5/25/11, pp. 32, 34).[4]

The Forest Service contends that the decision not to place warning signs alerting motorists as to the availability of turnouts implicates various policy considerations including the expense of placing additional signs along hundreds of miles of forest roads, the environmental impact of those signs, aesthetics, safety and practical concerns. More specifically, the Forest Service asserts that the cost, environmental and aesthetic concerns must be weighed against the perceived minimal safety benefit of providing signs alerting motorists as to the existence of something as open, obvious and intuitive as a turnout. (Defendant's Reply Brief in Support of Summary Judgment, p. 15).

When considering whether the discretionary function exception protects governmental decisions concerning visitor warning signs, courts typically distinguish between those situations where an agency fails to warn of a known and substantiated danger to the public and those in which the danger is unknown, unsubstantiated or remote. See Perez, 2010 WL 3927628 at *11 (noting that "NPS decisions regarding signage that do not fall within the exception tend to involve the failure to warn of a known (and often documented) hazard or danger"). In Cestonaro, for example, an action was brought on behalf of a decedent who was shot and killed in a parking lot on a National Historic Site which had been the subject of regular complaints and reports due to a high number of criminal incidents. Cestonaro, 211 F.3d at 751. The Park Service argued that its decision not to install additional lighting or to post signs warning of criminal danger on the parking lot was grounded in policy objectives because of the Park Service's overarching objective of maintaining the site in its

---

4       Plaintiffs do not argue that the Forest Service was negligent in the placement or construction of turnouts. (Transcript, Oral Hearing, 5/25/11, pp. 35, 44).

historic state.  Id. at 756.  The Court rejected this argument, holding that "the National Park Service

has not presented a viable argument as to how its alleged failure to warn is rooted in its policy

objectives."  Id. at 757.  However, the Third Circuit explicitly distinguished that case, where the

criminal threat in the parking lot was well-documented, from those in which the risk of danger from a

potential threat was low or unknown:

> Under proper circumstances, the National Park Service may balance
> aesthetic and safety interests and avoid liability through the
> discretionary function exception. To properly invoke an aesthetic
> interest, there must be a reasonable relationship between that interest
> and the challenged action. See discussion *infra* Part IV.C. See also
> Shansky, 164 F.3d at 695 (recognizing there must be a "plausible
> nexus between the challenged conduct and the asserted justification").
> The Shansky court, relying both on the National Park Service's lack of
> knowledge of any prior incidents at the site and its demonstrated
> efforts to restore the site in an historically accurate manner, found the
> requisite connection between policy and justification satisfied. 164
> F.3d at 695-96. As noted, neither factor pertains here.

Cestonaro, 211 F.3d at 757 n. 6.  Other courts have similarly refused to apply the discretionary

function exception where the Forest or Park Service fails to warn of a well-known danger.   See, e.g.,

George v. United States, 735 F. Supp. 1524, 1529-33 (M.D. Ala. 1990) (rejecting the Forest Service's

attempt to invoke the discretionary function exception when the plaintiff was attacked by an alligator

while swimming in a recreational swimming area because the Forest Service was aware of the danger

that large alligators present to swimmers and had received numerous complaints concerning that

particular alligator) (cited by Cestonaro, 211 F.3d at 756-57); see also Oberson v. United States, 514

F.3d 989, 998 (9th Cir. 2008) (refusing to apply the exception where the Forest Service failed to post a

sign warning of a steep hill on a snowmobile trail despite that "the Forest Service knew of the hazard

through its own investigation, which disclosed that sixteen days prior to [plaintiff's] accident the hill

in question had been the site of a potentially serious collision between a snow grooming machine and two snowmobiles.").

In contrast, where the agency identifies a potential hazard but perceives the risk of danger as low or is not aware of any past record of frequent injuries or accidents, courts have typically held that the agency's decision not to post warning signs is susceptible to policy analysis. See, e.g., Perez, 2010 WL 3927628 at *10 ("[C]ase law indicates that the manner in which the NPS identifies, abates and warns of hazards, once discovered, are the types of decisions susceptible to policy analysis."). In Perez, for example, a visitor to Buck Island Reef National Monument in the Virgin Islands was injured when bitten by a barracuda while swimming in shallow water. Id. at *1. The court held that the Park Service's failure to post signs warning of the threat of barracuda to swimmers was grounded in public policy because the government had "no knowledge that a barracuda attack in shallow water was likely" and the risk of such an attack was extremely remote. Id. at *13.

Similarly, in Miller v. United States, 642 F.Supp.2d 437, 443 (M.D. Pa. 2009), the plaintiff brought suit after she suffered an injury when she fell into a drainage ditch during a visit to Gettysburg National Military Park, arguing that the Park Service should have placed signs warning of the danger presented by uncovered drainage ditches. Id. at 441. The Court dismissed the action, holding that the National Park Service's "decision not to provide coverings or signs around potential hazards [in a National Park] is susceptible to a policy analysis, with the underlying policies being the economic concerns inherent in placing signs and coverings over every potential hazard throughout a nearly 6,000 acre park, as well as the environmental and aesthetic concerns of maintaining the historical integrity of the Park's landscape . . ." Id. at 443.

In Bowman v. United States, 820 F.2d 1393 (4th Cir. 1987), the Fourth Circuit held that the National Park Service's decision as to the placement of a guardrail was shielded by the discretionary function exception. In reaching its decision, the Court noted the many policy factors inherent in such decisions, including the Park Service's own assessment as to the severity of the potential risk:

> National Park Service officials have more than safety in mind in determining the design and use of man-made objects such as guardrails and signs along the Parkway. These decisions require balancing many factors: safety, aesthetics, environmental impact and available financial resources. In making each decision these factors must be weighed carefully in accordance with the policies of the National Park Service. The stretch of highway in question was straight, the cleared vista and steep slope were open and obvious. The evidence indicates that some thirty years ago the Government considered installing a guardrail at Milepost 319.6 but elected not to do so. Whether that decision grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three is not known. What is obvious is that the decision was the result of a policy judgment. One can argue that another policy, which places greater emphasis upon safety, is more desirable. However, by the discretionary function exception, Congress intended to prevent courts from second-guessing federal policy.

Bowman, 820 F.2d at 1395. See also Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995) ("The related decision regarding which natural hazards should have been brought to the attention of the public through pamphlets or brochures similarly implicates public policy concerns. Faced with limited resources and unlimited natural hazards, the NPS must make a public policy determination of which dangers are obvious and which dangers merit the special focus of a warning . . .").[5]

Here, the Plaintiff has failed to provide any record evidence of any accidents or injuries occurring on FR 154 between 2001, when the Forest Service improved the road by creating additional turnouts and adding a limestone surface, and 2005, when Plaintiffs suffered their injuries.

---

[5] The government argues, as part of its overall policy calculus, that the placement of signs advising as to the availability of turnouts is unnecessary because the turnouts are an easily identifiable feature of the road. (Defendant's Reply Brief in Support of Summary Judgment, p. 15). Having reviewed the photographs of turnouts submitted by Plaintiffs' expert, the government's contention that the turnouts are open and apparent is clearly reasonable.

(Transcript, Oral Hearing, 5/25/11, pp. 62-63, 85; Salm Supp. Decl., ¶ 19). Indeed, Forest Engineer Salm submitted an unrebutted declaration that the Forest Service was not aware of any accidents on FR 154 during this relevant time period. (Salm Decl., ¶ 26; Salm Depo., pp. 7, 73-74, 101-02). In addition, Pennsylvania State Police crash reporting data obtained by Plaintiffs reveals no accidents with personal injuries during the years in question and only one accident with property damage, without indicating whether that accident occurred in the ANF or in the township immediately adjacent. (Plaintiffs' Ex. T, Crash Data Reporting). Given the absence of any evidence establishing that the lack of signage advising motorists as to the presence of turnouts on FR 154 posed a serious risk of injury, the Forest Service's decision to forgo such signage based on policy considerations such as aesthetics, practicality, environmental concerns, and funding is protected by the discretionary function exception. See Perez, 2010 WL 3927628 at *10; Miller, 642 F.Supp.2d at 443; Valdez, 56 F.3d at 1180.

4) Failure to Post Speed Limit Signs

Plaintiffs' final contention is that the Forest Service negligently failed to post safe and appropriate speed limits within the ANF. The Forest Service asserts that its decision not to post speed limit signs on unpaved roads within the forest is grounded in public policy considerations such as safety, practicality, aesthetics, and cost. (Defendant's Brief in Support of Summary Judgment, pp. 14-15). Specifically, the record reflects that the Forest Service made the decision not to post speed limit signs on unpaved roads because "the surface condition of such roads can vary significantly throughout the year" making it difficult to accurately advise motorists as to the appropriate speed. (Salm Decl., ¶ 20). For example, a posted speed limit based upon the condition of a road immediately after it has been graded might mislead motorists into driving too fast during the

inclement weather months when the road conditions deteriorate. On the other hand, a very low speed limit that accounts for poor road conditions would likely be ignored during times when the road is smooth and graded. Given this concern, the Forest Service decided that public safety was best served by allowing motorists to utilize their own common sense based on current road conditions. Other factors considered by the Forest Service included the cost of placing speed limit signs along the approximately 1,300 miles of road within the ANF and the aesthetic impact of excessive signage in a national forest. As discussed above, each of these factors supports the conclusion that the Forest Service's decision not to place speed limit signs within the ANF was a valid exercise of policy-based judgment. See, e.g., Miller, 642 F.Supp.2d at 443 (holding that the National Park Service's "decision not to provide coverings or signs around potential hazards [in a National Park] is susceptible to a policy analysis, with the underlying policies being the economic concerns inherent in placing signs and coverings over every potential hazard throughout a nearly 6,000 acre park, as well as the environmental and aesthetic concerns of maintaining the historical integrity of the Park's landscape . . ."); Elder v. United States, 312 F.3d 1172 (10th Cir. 2002) (National Park Service's decision not to place signs warning of slippery rocks in a National Park where several visitors had slipped and fallen to their deaths was based upon environmental and aesthetic policy considerations).

Alternatively, Plaintiffs' negligence claim based upon the Forest Service's failure to post speed limit signs is also subject to dismissal because the factual record conclusively demonstrates the lack of any causal link between the omission of speed limit signs and the injuries suffered by Plaintiffs. In order to maintain a negligence claim under Pennsylvania law, a plaintiff must establish the following four elements: (1) a duty or obligation recognized by law; (2) a failure to conform to the standard of care required by that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3rd Cir. 2005). A causal connection between the breach of a duty and the resulting injury is established where the conduct representing the breach is a "substantial factor" in bringing about the harm. Mack

v. AAA Mid-Atlantic, Inc., 511 F.Supp.2d 539, 546 (E.D. Pa. 2007). Here, it is undisputed that Mazzocco came to a complete stop when he pulled his vehicle off to the side of the road to allow the oncoming motorist to pass. It is further undisputed that the accident occurred when Mazzocco struck a pothole immediately after accelerating from that dead stop to regain the crown of the single lane road. Given that the speed of Mazzocco's vehicle played no role in the accident, it is axiomatic that the lack of a posted speed limit could not have caused Plaintiffs' injuries.


## IV.   CONCLUSION

For the foregoing reasons, the Forest Service's decisions with respect to the maintenance, inspection, and posting of signs on FR 154 falls within the discretionary function exception to the FTCA's waiver of sovereign immunity. As such, the government's motion for summary judgment is granted.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT A. BREWER, *et al.*,                )
                                            )
                    Plaintiffs,             )
        v.                                  )        C.A. No. 08-196 Erie
                                            )        District Judge McLaughlin
UNITES STATES OF AMERICA,                   )
                                            )
                    Defendant.              )
                                            )
                                            )

## ORDER

AND NOW, this 12th day of July, 2011, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED. Judgment is entered in favor of Defendant and against Plaintiffs. This matter is closed.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___